UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

JAMES KINGSTON,      )
                     )
    Plaintiff      )
                     )
v.                   )      Case No. 3:07-CV-270 RM
                     )
THE FORD METER BOX COMPANY, )
INC.,                )
                     )
    Defendant      )

<u>OPINION and ORDER</u>

This cause is before the court on The Ford Meter Box Company, Inc.'s

motion for summary judgment as to James Kingston's claims that the defendant

violated his rights under 42 U.S.C. § 12112 of the Americans with Disabilities Act

("ADA") by not providing him with reasonable accommodations to his disability

(Count II) and not keeping his medical condition confidential (Count III).[1] For the

reasons that follow, the court grants Ford Meter's summary judgment motion.


I. Factual Background

The following facts are taken from the summary judgment record and are

viewed in the light most favorable to Mr. Kingston, the nonmoving party. The court

includes only those facts relevant to Mr. Kingston's remaining claims in Counts

---

[1]In response to Ford Meter's summary judgment motion, Mr. Kingston abandoned his
claims that he was terminated because of his disability or his perceived disability (Count I) and/or
his age (Count IV).

II and III. Ford Meter manufactures valves, fittings, meter boxes, and other components used in the water works industry at its plant in Wabash, Indiana. Ford Meter hired Mr. Kingston in November 2002 as supervisor of its foundry maintenance department. As supervisor, Mr. Kingston was responsible for administrative tasks such as attending production meetings, scheduling work orders, managing employees, and reviewing and approving employee time cards. He also was responsible for oversight, including patrolling the production floor to review the quality of maintenance work. Mr. Kingston supervised a staff of three assistant supervisors and twenty-one or twenty-two maintenance workers.

Mr. Kingston was diagnosed with chronic obstructive pulmonary disease (COPD) in March 2005. COPD is a progressive disease that impairs one's ability to breathe, with symptoms of emphysema. As a result of the COPD, Mr. Kingston experienced "extreme fatigue" and without his breathing treatments, suffered from shortness of breath that he described as almost debilitating, making it so he could barely function or do anything of a physical nature. A combination of medications and breathing treatments mitigated some of Mr. Kingston's symptoms. For example, with breathing treatments, Mr. Kingston wasn't limited in the distance he could walk as long as he could take periodic breaks, at times having to sit down, to catch his breath. Mr. Kingston testified that within a hundred yards, he would have to stop twice to catch his breath.[2] He testified that he isn't limited in

---

[2]Mr. Kingston also testified that he would need to take a break to get to his mailbox, which was about one hundred feet away from his front door.

standing, sitting or driving, can lift items at a moderate pace, care for himself, and go grocery shopping at a slow pace. Mr. Kingston can't be intimate with his wife, climb, play with his grandsons, split firewood, perform hobbies such as woodworking, concrete work, and stonework, or go biking, all of which he was previously capable of doing.

Mr. Kingston informed Ford Meter's plant nurse, Jan Mattern, of his condition in early 2006; she told him that he might be eligible for FMLA and gave him the necessary information. Shortly thereafter, Mr. Kingston's supervisor, John Andersen, told him he needed to spend more time on the floor and in response, Mr. Kingston informed Mr. Andersen of his condition. In February or March 2006, Mr. Kingston met with Ms. Mattern and Mr. Andersen and he again discussed his condition, but this time told them of his limitations and what provisions could be made to help him perform his job. Mr. Kingston said his fatigue and shortness of breath limited him, and that it took him longer to engage in physical activity because he had to stop and rest.

During the meeting, Mr. Kingston asked if he could send his assistant, Dave Hawkins, to the production meetings, so he wouldn't have to walk from the back of the plant to the front and up the stairs to the conference room. Mr. Andersen responded that "on the days that you don't feel like you can make it, send Dave." Mr. Kingston thought this response was inadequate. Although he could physically walk to the meetings, it took him a long time, was very tiring, and embarrassing. Mr. Kingston also asked if Mr. Hawkins could patrol the production floor in his

place; Mr. Andersen agreed to this request. At this time, Mr. Kingston requested Ms. Mattern and Mr. Andersen to keep his condition confidential. Mr. Kingston didn't address his condition or restrictions specifically with Ms. Mattern and Mr. Andersen after this meeting, but discussed his condition with Mr. Hawkins upon Mr. Andersen's directive.

Mr. Kingston turned his patrolling duties over to Mr. Hawkins. For the most part, Mr. Kingston stopped monitoring the production floor and performed primarily administrative tasks. Mr. Kingston never sent Mr. Hawkins to the productions meetings. On at least two occasions, Mr. Kingston told Mr. Andersen he was having a rough day and was going to send Mr. Hawkins, but Mr. Andersen responded that "I really think you need to be in the meeting." After that, Mr. Kingston felt compelled to go to the meetings. Although there was an elevator that Mr. Kingston could have used to avoid most of the stairs, he only used the elevator once or twice because it was "usually in use."

Mr. Kingston submitted FMLA paperwork on May 19, 2006. The paperwork indicated that he might need time off work related to his COPD, but didn't identify any specific work restrictions or needed accommodations. His health care provider indicated that when experiencing an exacerbation, Mr. Kingston would be unable to perform any work and that his condition might sometimes require emergency room visits or even hospitalization. Mr. Kingston was approved for intermittent FMLA leave.

Mr. Kingston testified that even with his breathing difficulties he could fulfill all the responsibilities of his job, including patrolling the production floor, but at a much slower pace. Even at a slower pace, Mr. Kingston testified that he had enough time to complete his tasks and was qualified to be a foundry maintenance supervisor.

After Mr. Kingston discussed his condition with Ms. Mattern, Mr. Andersen, and Mr. Hawkins, there was a production meeting among the foundry production supervisors. Mr. Kingston didn't attend the production meeting, but co-workers Bob Corn, Ronald Karg, Myron Sites, and Mike Jones told him his condition was a topic of conversation during the meeting. A week or so later, the president of Ford Meter, Steve Ford, approached Mr. Kingston and started discussing his condition and informed Mr. Kingston that his condition was discussed at the production meeting. Mr. Kingston isn't aware of the specifics of what was discussed at the production meeting or who initiated the conversation.[3]

Mr. Anderson and Ms. Mattern submitted affidavits stating that they didn't discuss Mr. Kingston's condition with anyone, except that Mr. Ford was advised of Mr. Kingston's condition in connection with a request for a larger uniform that Mr. Kingston needed because of weight gain related to his medication.

---

[3] Ford Meter submitted affidavits from Bob Corn, Ronald Karg, Myron Sites, and Mike Jones stating that they never heard issues related to Mr. Kingston's medical condition discussed at any meeting at Ford Meter and never told Mr. Kingston that his condition was discussed at a production meeting. Ford Meter also submitted an affidavit from Steve Ford stating that he isn't aware of any discussion of Mr. Kingston's medical condition at a production meeting. Because these statements contradict Mr. Kingston's testimony — testimony a jury might believe — the court doesn't consider them for purposes of deciding this summary judgment motion.

Around the time that Mr. Kingston turned his patrolling duties over to Mr. Hawkins, Ford Meter disciplined Mr. Kingston for issues occurring on the production floor. Mr. Andersen criticized Mr. Kingston for disorganization and uncleanliness within the shop and storage room. He also criticized him for the vandalism of a fax machine in the storage room because Mr. Andersen had previously asked Mr. Kingston to secure the storage room. Mr. Kingston directed his assistant supervisors to keep the storage room locked, but it wasn't locked at the time of the vandalism. Ford Meter also issued Mr. Kingston a disciplinary notice after learning of two incidents of employees sleeping on third shift.

Ford Meter submits further evidence that Mr. Kingston estimated employee time cards against company policy because he wanted to leave for vacation on the Friday before a holiday weekend. Mr. Kingston testified that he estimated the time cards for the last shift ending at 2:00 a.m. and that it was standard practice at Ford Meter to estimate time cards before a holiday weekend so they could be submitted by Saturday as required (instead of Monday as normally required).

 Mr. Kingston received the lowest raise given to any supervisor in 2006; according to Mr. Andersen, this was due to a perceived lack of leadership. Christopher Shanks, the plant's general manager, terminated Mr. Kingston on July 14, 2006. Mr. Kingston was informed that he was terminated due to a difference in management style. Mr. Shanks contends that Mr. Kingston was terminated for the time card incident, coupled with his frustration over Mr. Kingston's continued managerial deficiencies.

## II. Discussion

Summary judgment is appropriate when "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In deciding whether a genuine issue of material fact exists, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). No genuine issue of material fact exists when a rational trier of fact could not find for the nonmoving party even when the record as a whole is viewed in the light most favorable to the nonmoving party. O'Neal v. City of Chicago, 392 F.3d 909, 910-911 (7th Cir. 2004). A nonmoving party cannot rest on mere allegations or denials to overcome a motion for summary judgment; "instead, the nonmovant must present definite, competent evidence in rebuttal." Butts v. Aurora Health Care, Inc., 387 F.3d 921, 924 (7th Cir. 2004). Specifically, the nonmoving party must point to enough evidence to show the existence of each element of its case on which it will bear the burden at trial. Celotex v. Catrett, 477 U.S. 317, 322-323 (1986); Lawrence v. Kenosha Cty., 391 F.3d 837, 842 (7th Cir. 2004).

*A. Count I - Reasonable Accommodation*

Mr. Kingston alleges that Ford Meter violated his rights by not engaging in the interactive process after he requested reasonable accommodations, by disciplining him for not performing certain job duties for which he had sought an accommodation, and by refusing to actually accommodate his disability. Under the ADA, failure to make reasonable accommodations for a known disability constitutes unlawful discrimination. 42 U.S.C. § 12112(b)(5)(A). To prevail on this claim, Mr. Kingston must show that: (1) he is a qualified individual with a disability; (2) Ford Meter was aware of his disability; and (3) Ford Meter didn't reasonably accommodate the disability. Mobley v. Allstate Ins. Co., 531 F.3d 539, 545 (7th Cir. 2008) (citing EEOC v. Sears, Roebuck & Co., 417 F.3d 789, 797 (7th Cir. 2005)). This third element also requires "that [the] employer and employee engage in an interactive process to determine a reasonable accommodation." Id. (quoting Baert v. Euclid Beverage, Ltd., 149 F.3d 626, 633 (7th Cir.1998)).

In assessing whether Mr. Kingston's condition constitutes a disability for purposes of subsection 42 U.S.C. § 12102,[4] the court should: (1) determine

---

[4] Although neither party addressed it, the ADA was amended by the ADA Amendments Act of 2008 (ADAAA),which took effect on January 1, 2009. Pub. L. No. 110-325, 122 Stat. 3553. In passing the ADAAA, Congress intended to reinstate the "broad scope of the protection to be available under the ADA." Congress explicitly overruled those cases that had "narrowed the broad scope of protection intended to be afforded by the ADA," and which have, as a result, "eliminat[ed] protection for many individuals whom Congress intended to protect." See ADAAA, Pub. L. No. 110-325. Congress rejected the Supreme Court's reasoning in "Sutton v. United Airlines, Inc., 527 U.S. 471 (1999) . . . that whether an impairment substantially limits a major life activity is to be determined with reference to the ameliorative effects of mitigating measures." ADAAA, Pub. L. 110-325(b)(2). Congress further rejected the holding in Toyota Motor Mfg. v. Williams interpreting the term "substantially limits" to require a greater degree of limitation than was intended and its finding that the terms "substantially" and "major" "need to be interpreted strictly to create a demanding standard for qualifying as disabled." ADAAA, Pub. L. 110-325(a)(7) and (b)(4).

The ADAAA however isn't retroactive. See Kiesewetter v. Caterpillar, Inc., 295 Fed. App. 850, at *1 (7th Cir. October 9, 2008) (unpublished) (citing Landgraf v. USI Film Products, 511 U.S.

whether the employee's condition is a physical or mental impairment; (2) identify an affected life activity and determine whether it constitutes a "major life activity" for purposes of the ADA; and (3) determine whether the plaintiff's impairment was a substantial limit on the identified major life activity. Moore v. J.B. Hunt Transp., Inc., 221 F.3d 944, 950-951 (7th Cir. 2000) (*citing* Bragdon v. Abbott, 524 U.S. 624, 631-632, 637-639 (1998)).[5]

Ford Meter doesn't appear to dispute that Mr. Kingston's COPD qualifies as an impairment for purposes of the ADA, so analysis turns to whether his COPD affects one or more major life activities. EEOC regulations interpreting the ADA define "major life activities" by providing an illustrative, non-exhaustive list which includes "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i); *see also* Sinkler v. Midwest Prop. Mgmt. Ltd. P'ship, 209 F.3d 678, 683-84 (7th Cir. 2000). Mr. Kingston testified that his COPD impairs his ability to breathe and causes extreme fatigue. Without his treatments, Mr. Kingston's

---

244 (1994)); see also Ekstrand v. School District of Somerset, 2009 WL 564672, at *8 (W.D. Wis. March 3, 2009); Burkhart v. Intuit, Inc., 2009 WL 528603 (D. Ariz. March 2, 2009); Young v. Precision Metal Products, Inc., 2009 WL 507632 (D. Conn. Feb. 11, 2009). The court therefore applies the law in effect when the complained-of acts occurred.

[5] The ADA also protects a person from discrimination by an employer that regards him as substantially limited in a major life activity. *See* Squibb v. Memorial Medical Center, 497 F.3d 775, 786 (7th Cir. 2007). Mr. Kingston's claim in Count I rests on Ford Meter's knowledge of his claimed disabilities and failure to accommodate those disabilities. He hasn't presented any evidence that suggests that Ford Meter's beliefs about his limitations exceeded the scope of his actual limitations. *See* Squibb v. Memorial Medical, 497 F.3d at 786. Mr. Kingston abandoned his claim that he was terminated because of his perceived disability, so the court doesn't address whether Ford Meter perceived Mr. Kingston as having a disability.

condition is almost debilitating. Mr. Kingston's symptoms are mitigated with his treatment and medication, and when considering whether Mr. Kingston is substantially limited in a major life activity, the court can consider the mitigating effects of his treatment and medication. *See* Moore v. J.B. Hunt Transp., 221 F.3d at 952, n. 4; Sutton v. United Airlines, Inc., 527 U.S. 471, 119 S. Ct. 2139, 2146 (1999) ("Looking at the Act as a whole, it is apparent that if a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures-both positive and negative-must be taken into account when judging whether that person is 'substantially limited' in a major life activity and thus is 'disabled' under the Act.").

Mr. Kingston lists the following life activities as affected by his condition even with medication: walking, being intimate with his wife, climbing, playing with his grandsons, splitting firewood, performing hobbies such as woodworking, concrete work, and stonework, and biking. Playing with grandchildren, splitting firewood and engaging in other hobbies don't qualify as major life activities. *See* Moore v. J.B. Hunt., 221 F.3d at 951 (bowling, camping, restoring cars, and mowing the lawn aren't major life activities); *see also* Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 202 (2002) (playing with children); Rivera v. Potter, No. 00-C-8128, 2002 WL 32068972, at *3 (N.D. Ill. Sept. 26, 2002) (recreational activities).

Sexual reproduction has been held to be a major life activity, but our court of appeals hasn't established a rule that sexual relations are a major life activity

for ADA purpose. *See* <u>Squibb v. Memorial Medical</u>, 497 F.3d at 785 (deferring the question). Even were this court to conclude that sexual relations is a major life activity, Mr. Kingston must produce evidence beyond his own conclusory testimony that he cannot be intimate with his wife. *See* <u>id.</u> (*citing* <u>Contreras v. Suncast Corp.</u>, 237 F.3d 756, 764 (7th Cir. 2001) ("[E]ven if we assume that engaging in sexual relations is a major life activity, Contreras has not substantiated his claim of sexual difficulties with any documentation or testimony beyond a general assertion that the frequency with which he has relations has decreased."). Mr. Kingston has provided no other evidence of his claimed sexual limitation, and it can't be easily inferred from the evidence presented.

Additionally, when a "discrimination claim centers on a request for a workplace accommodation, there must be some causal connection between the major life activity that is limited and the accommodation sought." *See* <u>Squibb v. Memorial Medical</u>, 497 F.3d at 785 (*citing* <u>Nuzum v. Ozark Auto. Distribs., Inc.</u>, 432 F.3d 839, 848 (8th Cir.2005)). There is no casual connection between the ability to engage in sexual relations and the accommodations Mr. Kingston sought. *See* <u>Squibb v. Memorial Medical</u>, 497 F.3d at 785.

Walking, however, is a major life activity, *see* 29 C.F.R. § 1630.2(i), that Mr. Kingston had to perform as part of his job. The issue, then, is whether Mr. Kingston was "substantially limited" in his ability to walk. The interpretive regulations define "substantially limits" as "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular

major life activity as compared to the condition, manner, or duration under which an average person in the general population can perform the same major life activity." 29 C.F.R. § 1630.2(j)(1)(ii); *see also* <u>Moore v. J.B. Hunt Transp.</u>, 221 F.3d at 951. Stated differently, Mr. Kingston must be "substantially limited" in his ability to walk, and the limitation must be permanent or long term and considerable compared to the walking most people do in their daily lives. <u>EEOC v. Sears, Roebuck</u>, 417 F.3d at 802.

In <u>Moore v. J.B. Hunt</u>, the court found that the plaintiff's rheumatoid arthritis didn't substantially limit his ability to walk. 221 F.3d at 951. In that case, "Mr. Moore testified that he walks distances of less than a mile 'consistently,' that a mile walk 'wouldn't be any problem as long as I'm paying attention to what I'm doing,' and that the arthritis affects more the 'rate and pace' of his activities as opposed to his ability to perform them." <u>Moore v. J.B. Hunt</u>, 221 F.3d at 951. The court found that these limitations weren't "significant restrictions" on Mr. Moore's ability to walk when compared with the ability of the average person. <u>Id.</u> (*citing* <u>Talk v. Delta Airlines, Inc.</u>, 165 F.3d 1021, 1025 (5th Cir.1999) (holding that "walk[ing] with a limp[,] mov[ing] at a significantly slower pace than the average person" and having difficulty walking in extreme cold did not constitute a substantial impairment as required by the ADA)).

More recently, in <u>EEOC v. Sears, Roebuck</u>, 417 F.3d at 802, the court found that an employee's difficulty in walking was a "substantial limitation." Ms. Keane couldn't walk more than the equivalent of a city block without losing sensation in

her leg and once that happened, walking became "nearly impossible and extremely slow." Id. at 802. She would feel as though she had to take both of her hands and lift her leg up to take one step at a time. Id. Based on these facts, the court found that a reasonable jury could conclude that Ms. "Keane's severe difficulty in walking the equivalent of one city block was a substantial limitation compared to the walking most people do daily." Id. at 802.

Mr. Kingston's impairment falls somewhere between Mr. Moore's and Ms. Keane's. Mr. Kingston's COPD caused him to suffer from extreme fatigue and shortness of breath. Even with medication, Mr. Kingston had to walk slowly and could only walk about fifty feet before he had to stop for a few minutes to catch his breath. He testified that he had difficulty climbing stairs, that he had to do so slowly, and that it was very tiring.[6] On the other hand, he testified that he could fulfill all the responsibilities of his job, albeit at a much slower pace. Further, when he filled out his FMLA paperwork, Mr. Kingston didn't specifically identify any work restrictions. When considering all the facts presented in light most favorable to Mr. Kingston, the court finds that this case is more akin to Moore v. J.B. Hunt and that a reasonable jury couldn't conclude that the rate and pace

---

[6] Mr. Kingston also generally asserts that he is unable to "climb." The court of appeals hasn't determined whether climbing qualifies as a major life activity. See Jay v. Intermet Wagner Inc., 233 F.3d 1014, 1016 (7th Cir. 2000) (deferring the question). He testified though that he was able to climb stairs with limitations, and there is no evidence indicating what other climbing activities Mr. Kingston had difficulty performing. General assertions that he couldn't climb are insufficient to create a genuine issue of material fact that he was limited in a major life activity.

limitations on Mr. Kingston's ability to walk were substantial limitations compared to the walking most people do daily.

Even if Mr. Kingston was a qualified individual with a disability, Ford Meter reasonably accommodated Mr. Kingston's disability. Ford Meter was aware of Mr. Kingston's condition; the remaining question therefore is whether Ford Meter reasonably accommodated him. 42 U.S.C. § 12112(a), (b)(5)(A); *see* Ekstrand v. School Dist. of Somerset, No. 08-CV-193, 2009 WL 564672, at * 11 (W.D. Wis. March 3, 2009). "It is the employer's prerogative to choose a reasonable accommodation; an employer is not required to provide the particular accommodation that an employee requests." EEOC v. Sears, Roebuck, 417 F.3d at 802 (*citing* Jay v. Intermet Wagner, 233 F.3d at 1017). The employer must provide an accommodation that effectively accommodates the disabled employee's limitations. Id. (*citing* U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 400, 122 S. Ct. 1516 (2002)). An employer "must be willing to consider making changes in its ordinary work rules, facilities, terms, and conditions in order to enable a disabled individual to work." Beck v. Univ. of Wis. Bd. of Regents, 75 F.3d 1130, 1135 (7th Cir. 1996) (*citing* Vande Zande v. State of Wis. Dept. of Admin., 44 F.3d 538, 543 (7th Cir. 1995)).

The ADA imposes on an employee the "initial duty to inform the employer of a disability." EEOC v. Sears, Roebuck, 417 F.3d at 803. "Where notice is ambiguous as to the precise nature of the disability or desired accommodation, but is sufficient to notify the employer that the employee may have a disability

that requires accommodation, the employer must ask for clarification." Id. at 804 (*citing* Bultemeyer v. Fort Wayne Cmty. Schools, 100 F.3d 1281, 1285 (7th Cir. 1996)). The interactive process "imposes a duty on employers to engage in a flexible give-and-take with the disabled employee so that together they can determine what accommodation would enable the employee to continue working." EEOC v. Sears, Roebuck, 417 F.3d at 805 (*citing* Gile v. United Airlines, Inc., 213 F.3d 365, 373 (7th Cir. 2000)).

"If this process fails to lead to reasonable accommodation of the disabled employee's limitations, responsibility will lie with the party that caused the breakdown." EEOC v. Sears, Roebuck, 417 F.3d at 805. There is no hard and fast rule in determining which party caused a breakdown in the process, but as explained in Beck v. Univ. of Wis.:

> [C]ourts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.

75 F.3d at 1135. A failure to engage in the interactive process must have resulted in a failure to identify an appropriate accommodation for the qualified individual. Mobley v. Allstate, 531 F.3d at 546 (*citing* Rehling v. City of Chicago, 207 F.3d 1009, 1016 (7th Cir.2000)). The burden of showing that a reasonable accommodation existed remains on the employee. *See* Ozlowski v. Henderson, 237

F.3d 837, 840 (7th Cir. 2001); <u>Williams v. Eastside Lumberyard and Supply Co.,</u> <u>Inc.</u>, 190 F. Supp. 2d 1104, 1119 (S.D. Ill. 2001).

Mr. Kingston informed his supervisor, Mr. Andersen, and the plant nurse, Ms. Mattern, of his condition and limitations. Because of his physical limitations, Mr. Kingston asked if Mr. Hawkins could patrol the production floor in his place, and Mr. Andersen agreed to this request. Mr. Kingston acknowledges that Ford Meter provided the requested accommodation, but argues that this accommodation wasn't sincere because Ford Meter continued to hold him responsible for the department's dirtiness and disorganization and disciplined him for two incidents of employees sleeping on the job. Mr. Kingston contends that Ford Meter didn't reasonably accommodate his disability when punishing him for actions he supposedly wasn't required to perform.

Mr. Kingston's responsibilities included supervising employees and overseeing the department. His job description lists "[m]aintain[ing] a safe, clean and orderly work environment," as well as a host of other supervisory responsibilities as the "essential" duties of his job. Ford Meter and Mr. Kingston engaged in the interactive process about patrolling the production floor, so the issue is whether Ford Meter should have further engaged in the interactive process and provided additional accommodations to Mr. Kingston by relieving him of some of his supervising responsibilities.

"[T]he employer is not required to give the disabled employee preferential treatment . . . by waiving his normal requirements for the job in question."

Williams v. United Ins. Co. of Am., 253 F.3d 280, 282 (7th Cir. 2001) (*citing* Dalton v. Subaru-Isuzu Automotive, Inc., 141 F.3d 667, 678-79 (7th Cir. 1998)); DePaoli v. Abbott Lab., 140 F.3d 668, 675 (7th Cir.1998).Under the ADA, employers aren't required to change the essential functions of a job by reallocating job duties. Dey v. Milwaukee Forge, 957 F. Supp. 1043, 1052 (E.D. Wis. 1996) (*citing* 29 C.F.R. § 1630.2(o) and Milton v. Scrivner, Inc., 53 F.3d 1118, 1124 (10th Cir. 1995)); *see also* Jay v. Intermet Wagner, 233 F.3d at 1017 (employer isn't required to shuffle job responsibilities amongst employees to create a position to accommodate the employee's disability); Hammel v. Eau Galle Cheese Factory, 407 F.3d 852, 867 (7th Cir. 2005) ("Accommodations which require special dispensations and preferential treatment are not reasonable under the ADA . . .").

Mr. Kingston testified that even with his breathing difficulties he could fulfill all his job's responsibilities, including patrolling the production floor, but at a much slower pace. Although Ford Meter allowed Mr. Hawkins to be Mr. Kingston's eyes on the production floor, this didn't relieve him of his responsibility to supervise employees, nor did Mr. Kingston ever tell Ford Meter that he believed he shouldn't be held accountable for these supervisory duties. A reasonable jury therefore couldn't find that Ford Meter failed to provide Mr. Kingston appropriate accommodations or was responsible for a breakdown in the interactive process.

Mr. Kingston also contends that Ford Meter should have allowed his assistant, Mr. Hawkins, to attend production meetings in his place or should have engaged in the interactive process to determine an alternate reasonable

accommodation. When Mr. Kingston asked to send his assistant to the production meetings, Mr. Andersen responded that "on the days that you don't feel like you can make it, send Dave." In reality though, on the two occasions that Mr. Kingston asked if Mr. Hawkins could attend because he was having a "rough day," Mr. Andersen responded that "I really think you need to be in the meeting." There was a breakdown in the interactive process in this instance. Mr. Kingston informed Mr. Andersen of the accommodations he thought were reasonable and although Mr. Andersen appeared to agree, he effectively didn't allow Mr. Kingston to utilize the accommodation. A reasonable jury could conclude that Ford Meter was responsible for this breakdown in the interactive process.

As already noted, the failure to engage in the interactive process by itself doesn't give rise to relief. *See* <u>Ozlowski v. Henderson</u>, 237 F.3d at 840. Mr. Kingston testified that he could walk to the meetings, but had to go slowly and was very tired. He acknowledges that there was an elevator he was permitted to use, but that the elevator was often in use. Mr. Kingston doesn't present evidence of whether this meant he needed to wait for the elevator or that it was simply unavailable. He testified, however, that he had used the elevator before. In light of Mr. Kingston's job requirement to attend the production meetings, his ability to walk to the meetings slowly, and the potential use of the elevator, no reasonably jury could find that allowing Mr. Hawkins to attend every production meeting in Mr. Kingston's place was a reasonable request. *See* <u>Rauen v. U.S. Tobacco Mfg. Ltd. P'ship</u>, 319 F.3d 891, 897 (7th Cir. 2003) (finding that the employee's ability

to perform the essential functions of the job without accommodation surely weighs against the reasonableness of an accommodation). The ADA didn't require Ford Meter to assign another employee to take over part of Mr. Kingston's job responsibility. *See* <u>Peters v. City of Mauston</u>, 311 F.3d 835, 845 (7th Cir. 2002). Mr. Kingston hasn't identified any other accommodations that he sought or believed should have been discussed. No reasonable jury could find that the breakdown in the interactive process led to Mr. Kingston not receiving a reasonable accommodation.

No genuine issues of material fact exists; as a matter of law, Ford Meter fulfilled its duty under the ADA to reasonably accommodate Mr. Kingston.

### (B) Count III - Disclosure of Confidential Information

Mr. Kingston claims Ford Meter violated his rights pursuant to 42 U.S.C. § 12112(d) by disclosing his medical information to other employees during a production meeting. Employers are allowed to gather disability information from current employees in two ways: (1) they may "conduct voluntary medical examinations, including voluntary medical histories, which are part of an employee health program ..."; and (2) the employer "may make inquiries into the ability of an employee to perform job-related functions." 42 U.S.C. § 12112(d)(4)(B). The ADA requires that all information employers receive from these two channels be kept confidential. *See* 42 U.S.C. § 12112(d). Employers may ask employees about their medical information for certain job related purposes, but

once that information is obtained, they must keep it confidential, except that supervisors and managers may be informed about necessary restrictions or accommodations on work duties, first aid and safety personnel may be informed when appropriate, and government officials investigating compliance with this act can obtain the information. *See* 42 U.S.C. § 12112(d)(3) and (4); 29 C.F.R. § 1630.14(c)(1).

Although our court of appeals hasn't addressed this issue, several courts have found that the confidentiality provision in § 12112(d) and accompanying regulations doesn't apply when an employer voluntarily discloses medical information. *See e.g.* Cash v. Smith, 231 F.3d 1301 (11th Cir. 2000). In Cash v. Smith, the plaintiff "told [the defendant] of her diabetes diagnosis in confidence," but her disclosure wasn't part of a required medical examination or the result of the defendant's inquiry even though the plaintiff disclosed her condition while she was in the process of securing FMLA leave. 231 F.3d at 1303-1304. The Eleventh Circuit held that the confidentiality provisions of § 12112(d) weren't triggered under these circumstances because the plaintiff made a "voluntary disclosure" to the defendant. Id. at 1307-1308. *See also* U.S. EEOC v. Seven-Eleven of Haw., Inc., No. 07-00478, 2008 WL 4369335, at *1 (D. Haw. September 24, 2008) (an employer isn't legally obligated to maintain the confidentiality of medical information which an employee volunteers to his employer in relation to a request for an accommodation to a disability); Wiggins v. DaVita Tidewater, LLC, 451 F. Supp. 2d 789, 801-802 (E.D. Va. 2006) (agreeing with Cash v. Smith that medical

information voluntarily disclosed by the employee wasn't confidential within the meaning of the statute); <u>Ballard v. Healthsouth Corp.</u>, 147 F. Supp. 2d 529, 534 (N.D. Tex. 2001).

Other courts have distinguished <u>Cash v. Smith</u> when the employee was required to disclose medical information to receive FMLA benefits or accommodations. *See* <u>Doe v. U.S. Postal Serv.</u>, 317 F.3d 339, 345 (D.C. Cir. 2003). In <u>Doe v. U.S. Postal Serv.</u>, the court found that the employer made an "inquiry" when it threatened the employee with discipline unless he completed a medical-leave form explaining the nature of his medical condition (he was HIV positive). 317 F.3d at 341, 344. The court concluded "[u]nder the circumstances of this case, we think Doe's submission of the FMLA form was clearly a response to an employer inquiry, and not a voluntary disclosure." <u>Id.</u> at 344. Even assuming Doe submitted his FMLA request voluntarily, the court found that this "hardly means he volunteered his medical diagnosis." <u>Id.</u> "The Postal Service conditioned Doe's receipt of FMLA leave on his submission of supporting medical documentation," and therefore, the Postal Service, not Doe, "initiated the inquiry into his medical condition by asking for this medical certification." <u>Id.</u>

The court reasoned that employees are not required to "choose between waiving their right to avoid being publicly identified as having a disability and exercising their statutory rights-including the rights to FMLA leave and to 'reasonable accommodations' for their disabilities . . . that may depend on disclosure of their medical conditions." <u>Doe v. Postal Serv.</u>, 317 F.3d at 344. The

court further reasoned that this "result would run directly counter to Congress's purpose in enacting the ADA, which was, at least in part, to permit employers to inquire into employees' medical conditions in order to provide reasonable accommodations, while avoiding subjecting employees to the 'blatant and subtle stigma' that attaches to 'being identified as disabled.'" Id. (*citing* H.R. Rep. No. 101-485, pt. 2, at 75 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 357-58). *See also* Fleming v. State Univ. of New York, 502 F. Supp. 2d 324, 338 (E.D. N.Y. 2007) (sufficient facts existed to establish that plaintiff didn't volunteer his health information where the plaintiff alleged that his supervisor called him while he was in the hospital and asked him why he was there); EEOC v. Ford Motor Credit Co., 531 F. Supp. 2d 930, 933, 938 (M.D. Tenn. 2008) (an issue of fact existed as to whether disclosure was voluntary or in response to an inquiry where plaintiff was told by a supervisor that he must disclose his medical condition before he would be given an accommodation).

Mr. Kingston initially disclosed his condition to Ms. Mattern. He then disclosed his condition to Mr. Andersen, after Mr. Andersen told him that he needed to spend more time on the floor. Ms. Mattern and Mr. Andersen then met with Mr. Kingston to discuss his condition and limitations. Mr. Kingston doesn't dispute that he voluntarily disclosed his medical condition, but says he did so "during the course of fulfilling his statutory duty to put [Ford Meter] on notice of his disability and to request a reasonable accommodation."

Mr. Kingston didn't disclose his medical condition as a result of an employer inquiry. He disclosed his condition to Ms. Mattern and Mr. Andersen before they discussed his need for reasonable accommodations. This case is more akin to Cash v. Smith than to Doe v. U.S. Postal Serv. That Mr. Kingston was in the midst of invoking his statutory rights doesn't transform a voluntary disclosure into one that resulted from employer inquiry. *See* Willer v. Tri-County Metro. Transp. Dist. of OR, No. 07-CV-303, 2008 WL 3871744, at *14-16 (D. Or. 2008). Mr. Kingston wasn't required to make the initial disclosure to either Ms. Mattern or Mr. Andersen. For these reasons, no reasonable trier of fact could find on this record that the confidentiality provisions of § 12112(d) were triggered.

III. CONCLUSION

For the foregoing reasons, the court GRANTS The Ford Meter Box Company's motion for summary judgment. [Doc. No.24]. The clerk shall enter judgment accordingly.

SO ORDERED.

ENTERED: April 10, 2009

_____/s/ Robert L. Miller, Jr._____
Chief Judge
United States District Court

23